AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Eastern District of Virginia

MAR 1 5

CLERK, U.S. DISTRICT
NORFOLK, VA

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Information Associated with the Meta Platforms, Inc<br>account:https://www.facebook.com/profile.php?<br>id=100033712998738 | )<br>)<br>)<br>)<br>)<br>) |

UNDER SEAL

Case No.  4:24-sw-39

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1958(a) | Use of interstate commerce facilities in the commission of a murder for hire |

The application is based on these facts:

See affidavit

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

REVIEWED AND APPROVED:

Peter G. Osyf
Assistant United States Attorney

_____
*Applicant's signature*

Jeffrey Noel, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ 03/15/2024 _____

_____
*Judge's signature*

City and state:  Norfolk, Virginia

The Honorable Lawrence R. Leonard, U.S. Magistrate
*Printed name and title*

# ATTACHMENT A

## Property to Be Searched

This warrant applies to information associated with the Facebook User Identifier:

(1)   https://www.facebook.com/profile.php?id=100033712998738

that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered at 1601 Willow Road, Menlo Park, California, 94025.

## ATTACHMENT B

### Particular Things to be Seized

**I.      Information to be disclosed by Meta Platforms, Inc.,**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta Platforms, Inc., Meta Platforms, Inc. is required to disclose the following information to the government for each Facebook User Identifiers listed in Attachment A:

(a)      Any and all pictures/videos, including visual depictions of sent and/or received files of evidence of a conspiracy to commit murder-for-hire, conduct or other computer graphic files which would indicate the ownership of computer media. All Photoprints, including all photos uploaded by that user ID and all photos uploaded by any user that have that user tagged in them;

(b)      Messages, read or unread, maintained within the account, including stored or preserved copies of messages sent to and from the account, draft messages, deleted messages if available, the destination addresses associated with each message, the date and time at which each message was sent, and the size and length of each message, and any non-text or multimedia content sent with the messages; photos, videos, comments, and location information between **November 1, 2023 through present**. All other communications and messages made or received by the user, including all private messages and pending "Friend" requests; All messages, saved, drafted or in the inbox contained in Facebook Messenger.

(c)     All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the Internet Protocol ("IP") address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number), and any other records or information pertaining to the accounts; All information about the user's access and use of Facebook Marketplace;

(d)     The length of service (including start date), the types of service utilized by the user, and the means and source of any payments associated with the service (including any credit card or bank account number);

(e)     All privacy settings and other account settings;

(f)     All records pertaining to communications between Meta Platforms, Inc. and any person regarding the user or the user's Facebook, Inc. account, including contacts with support services and records of actions taken.

(g)     Contacts list between **November 1, 2023 through present**.

(h)     "Invite Friends" information, if available, between **November 1, 2023 through present**.

(i)    Log file information reported by the browser, including, but not limited to, web request, Internet Protocol (IP) address, browser type, referring/exit pages and URLS, number of clicks and how the user interacted with links on Instagram and Facebook, domain names, landing pages, pages viewed, and other information between **November 1, 2023 through present**.

(j)    All records or other information stored at any time by any individual using the account, including contact and friend lists, calendar data, pictures, telephone numbers, physical addresses, to-do lists, links to other messages, websites, emails, or internet addresses, and other files;

## II.    Information to be seized by the government

All information described above in Section I that constitute fruits, evidence and instrumentalities of violations of 18 U.S.C. § 1958(a), including, for Meta Platforms, Inc. Facebook User Identifier identified on Attachment A, information pertaining to the following matters:

(a) Evidence pertaining to material involving the evidence pertaining to the use of interstate commerce facilities in the commission of murder-for-hire.

Case No. 4:24-sw-39

**In Re Search Of:  Information Associated with the Meta Platforms, Inc. owned Facebook account:**

  (1)  https://www.facebook.com/profile.php?id=100033712998738

**that are Stored at the Premises Controlled by Meta Platforms, Inc.**

## AFFIDAVIT

## INTRODUCTION AND AGENT BACKGROUND

I, Jeffrey Noel, being duly sworn, hereby depose and state:

1.  I am a Special Agent with the United States Department of Justice, Federal Bureau of Investigation (FBI).  I have been employed by the FBI as a Special Agent since May, 2016.  As such, I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510 (7).  That is, I am an officer of the United States, who is empowered by law to conduct investigations regarding violations of United States law, to execute warrants issued under the authority of the United States, and to make arrests of the offenses enumerated in Title 18, United States Codes, Section 1341, Section 1343, and Section 1028A.  Prior to my employment with the FBI, I served as an officer in the United States Air Force for approximately ten years.  I am currently a member of the FBI Safe Streets Peninsula Resident Agency (PRA).  In the course of my duties, I am responsible for investigating crimes which include, but are not limited to, violent crimes, criminal organizations, crimes against children, financial crimes and robberies.  Since joining the FBI, your affiant has received specialized training in criminal investigations, identifying and seizing electronic evidence, recovery, and social site investigations.

2.  This affidavit is based upon information that I have gained from my investigation, my training and experience, and conversations with other law enforcement officers. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities (described in Attachment A) of violations of 18 U.S.C. § 1958(a) are within the information associated with the account mentioned above.

1

## LOCATION

3.    This affidavit is made in support of an application for a search warrant for information associated with the Meta Platforms, Inc. owned Facebook account:

(1) https://www.facebook.com/profile.php?id=100033712998738

that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company whose custodian of records is located at 1601 Willow Road, Menlo Park, California, 94025. The information to be searched is described in the following paragraphs and in Attachments A and B. This affidavit is made, in part, in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook, Inc. to disclose to the Government records and other information in its possession, pertaining to the subscriber or customer associated with the account, including the contents of communications.

## LEGAL AUTHORITY

### A.    Pertinent Criminal Statutes

4.    This investigation concerns alleged violations of Title 18, United States Code, § 1958(a), Use of interstate commerce facilities in the commission of murder-for-hire.

5.    Title 18, United States Code, §§1958(a) makes it a federal criminal offense to use the mail or any facility of interstate or foreign commerce with the intent that a murder be committed in violation of the laws of any State or the as a consideration for the receipt of, or as a consideration for a promise or agreement to pay, any thing of pecuniary value, or who conspires to do so.

### B.    Other Legal Authority

6.    The legal authority for this search warrant application regarding the Facebook, Inc. accounts is derived from 18 U.S.C. §§ 2701-2711, entitled "Stored Wire and Electronic Communications and Transactional Records Access." Section 2703(a) provides in relevant part as follows:

> A governmental entity may require the disclosure by a provider of electronic communication service of the contents of an electronic communication that is in electronic storage in an electronic communications system for one hundred and eighty days or less, only pursuant to a warrant issued under the Federal Rules of Criminal Procedure or equivalent State warrant. A governmental entity may require the disclosure by a provider of electronic communications services of the contents

2

of an electronic communication that has been in electronic storage in an electronic communications system for more than one hundred and eighty days by the means available under subsection (b) of this section.

7.   Title 18 U.S.C. § 2703(b) provides in relevant part as follows:

(1) A governmental entity may require a provider of remote computing service to disclose the contents of any wire or electronic communication to which this paragraph is made applicable by paragraph (2) of this subsection –

(A) without required notice to the subscriber or customer, if the governmental entity obtains a warrant issued under the Federal Rules of Criminal Procedure or equivalent State warrant.

(2) Paragraph (1) is applicable with respect to any electronic communication that is held or maintained on that service –

(A) on behalf of, and received by means of electronic transmission from (or created by means of computer processing of communications received by means of electronic transmission from), a subscriber or customer of such remote computing service; and

(B) solely for the purpose of providing storage or computer processing services to such subscriber or customer, if the provider is not authorized to access the contents of any such communications for purposes of providing any services other than storage or computer processing.

8.   This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711(3), 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. Facebook, Inc. accepts out-of-state and out-of-district service of subpoenas, court orders, and search warrants by use of their online submission service without the presence of a law enforcement officer. Accordingly, your affiant will execute the requested search warrant by use of their online submission service to the custodian of records at Facebook, Inc. and permission is requested for the data to be copied / obtained outside of the presence of a law enforcement officer. It is anticipated that Facebook, Inc. will produce the requested records in electronic format accompanied by a signed authentication letter via E-mail or on electronic media via U.S. Mail to your affiant.

3

## TECHNICAL BACKGROUND/FACEBOOK

9.      Meta Platforms Inc. owns and operates a free-access social networking website that can be accessed at http://www.facebook.com. Meta Platforms, Inc. allows its users to establish accounts with Facebook, Inc., and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook, Inc. users, and sometimes with the general public.

10.     Meta Platforms, Inc. asks users to provide basic contact information to Facebook, Inc., either during the registration process or thereafter. This information may include the user's full name, birth date, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook, Inc. also assigns a user identification number to each account.

11.     Facebook, Inc. users can select different levels of privacy for the communications and information associated with their Facebook, Inc. accounts. By adjusting these privacy settings, a Facebook, Inc. user can make information available only to himself or herself, to particular Facebook, Inc. users, to all Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. Facebook, Inc. accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook, Inc.

12.     Facebook, Inc. users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "Mini-Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

13.     Facebook, Inc. users can create profiles that include photographs, lists of personal interests, and other information. Facebook, Inc. users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook, Inc. users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

14.     Facebook, Inc. has a Photos application, where users can upload an unlimited number of albums and photos. Another feature of the Photos application is the ability to "tag" (i.e., label) other users in a photo or video. When a user is tagged in a photo or video, he or she

4

receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, a user's "Photoprint" includes all photos uploaded by that user that have not been deleted, as well as all photos uploaded by any user that have that user tagged in them.

15. Facebook, Inc. users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook, Inc. users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

16. Facebook Notes is a blogging feature available to Facebook, Inc. users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

17. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

18. Facebook, Inc. also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

19. In addition to the applications described above, Facebook, Inc. also provides its users with access to thousands of other applications on the Facebook platform. When a Facebook, Inc. user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

20. Some Facebook, Inc. pages are affiliated with groups of users, rather than one individual user. Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter. Facebook, Inc. can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group. Facebook, Inc. also assigns a group identification number to each group. Facebook, Inc. uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

21. Facebook, Inc. uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; Mini-Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook, Inc. user identification numbers; groups and networks of which the user is a member, including the groups' Facebook, Inc. group identification numbers;

5

future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook, Inc. applications.

22. Facebook, Inc. also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, Inc., including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook, Inc. profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

23. Social networking providers like Meta Platforms, Inc. typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook, Inc. users may communicate directly with Facebook, Inc. about issues relating to their account, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook, Inc. typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

24. Therefore, the computers of Meta Platforms, Inc. are likely to contain all the material just described, including stored electronic communications and information concerning subscribers and their use of Facebook, Inc., such as account access information, transaction information, and account application.

## DEFINITIONS

25. The terms "records," "documents," and "materials" include all information recorded in any form, including the originals and all non-identical copies thereof, whether different from the original by reason of any notation made on such copies or otherwise, including, but not limited to the following:

   a. graphic records or representations;
   b. photographs;
   c. pictures;
   d. images, and
   e. aural records or representations.

26. The terms "records," "documents," and "materials" include all of the foregoing, in whatever form and by whatever means, the records, documents, or materials, and their drafts, or their modifications may have been created or stored, including (but not limited to): any electrical, electronic, or magnetic form (including but not limited to any information on an electronic or magnetic storage device such as hard disks).

6

27. The term "computer" as used herein is defined pursuant to Title 18 U.S.C. § 1030(e)(1), as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

28. The term "Universal Resource Locator" (URL): A URL is the unique address for a file that is accessible on the Internet. For example, a common way to get to a website is to enter the URL of the website's home page file in the Web browser's address line. Additionally, any file within that website can be specified with a URL. The URL contains the name of the protocol to be used to access the file resource, a domain name that identifies the specific computer on the Internet, and a pathname, a hierarchical description that specifies the location of a file in that computer.

29. The term "Internet Protocol Address" (IP Address): This term refers to the fact that every computer or device on the Internet is referenced by a unique Internet Protocol address the same way every telephone has a unique telephone number. An example of an IP address is 192.168.10.102. Each time an individual accesses the Internet, the computer from which that individual initiates access is assigned an IP address. There are two types of IP addresses: static and dynamic. A static address is permanent and never changes, such as ones used in cable modems. The dynamic address changes almost every time the computer connects to the Internet.

30. The term "Internet Service Provider" (ISPs): This term refers to individuals who have an Internet account and an Internet-based electronic mail (e-mail) address must have a subscription, membership, or affiliation with an organization or commercial service which provides access to the Internet. A provider of Internet access and services is referred to as an Internet Service Provider or "ISP."

31. "Web hosts" provide the equipment and services required to host and maintain files for one or more websites and to provide rapid Internet connections to those websites. Most hosting is "shared," which means that multiple websites of unrelated companies are on the same server in order to reduce associated costs. When a client develops a Website, the client needs a server and perhaps a web hosting company to host it. "Dedicated hosting," means that the web hosting company provides all of the equipment and assumes all of the responsibility for technical support and maintenance of a website. "Co-location" means a server is located at a dedicated hosting facility designed with special resources, such as a secure cage, regulated power, a dedicated Internet connection, online security and online technical support. Co-location facilities offer customers a secure place to physically house the customers' hardware and equipment as opposed to keeping it in their offices or warehouse, where the potential for fire, theft or vandalism is greater.

7

32.    "Electronic Communication Service" refers to any service which provides to users thereof the ability to send or receive wire or electronic communications. Title 18 U.S.C. § 2510(15).

33.    "Remote Computing Service" is a service that provides to the public computer storage or processing services by means of an "electronic communications system." Title 18 U.S.C. § 2711.

34.    "Electronic Communications System" means any wire, radio, electromagnetic, photo-optical, or photo-electronic facilities for the transmission of wire or electronic communications, and any computer facilities or related electronic equipment for the electronic storage of such communications. Title 18 U.S.C. § 2510(14).

35.    "Contents," when used with respect to any wire, oral, or electronic communication, includes any information concerning the substance, purport, or meaning of that communication. Title 18 U.S.C. § 2510(8).

36.    "Electronic storage" means (a) any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and (b) any storage of such communication by an electronic communication service for purposes of backup protection of such communication. Title 18 U.S.C. § 2510(17).

## PROBABLE CAUSE TO SEARCH

37.    On January 22, 2024, a self-identifying individual, (hereafter, "VICTIM") called the FBI National Threat Operations Center (NTOC) to report a murder for hire threat against his own life. VICTIM was informed that a former roommate had recently been seeking somebody to kill him. VICTIM was made aware of the threat on his life through a family member that worked for the company Richard Van Tuyl, (VAN TUYL), used to work for, DEPCOM. VICTIM was told that on December 18, 2023, WITNESS 1, a co-worker of VAN TUYL, was asked by VAN TUYL, over the telephone, if WITNESS 1 knew anyone that could get rid of somebody. Furthermore, VAN TUYL stated, "POS needs a ride up". In addition to asking if anyone could get rid of VICTIM, VAN TUYL simultaneously sent screenshots of VICTIM's personal information including an address, date of birth, email addresses and telephone number from an internet site, beenverified.com.

38.    FBI NTOC forwarded the complaint to the Columbia South Carolina Division of the FBI because VICTIM lived in South Carolina. The FBI Columbia Division conducted several interviews to include VICTIM, WITNESS 1, and WITNESS 2.

39.    VICTIM was interviewed on January 19, 2024. VICTIM first met VAN TUYL in early-2019 when VICTIM and his wife rented a room to VAN TUYL. In the same year, VAN TUYL became delinquent on paying rent and VICTIM issued a 30-day notice to pay. When

8

VAN TUYL failed to pay rent, VICTIM evicted VAN TUYL. Upon final departure from the residence, VAN TUYL told VICTIM the next time he saw VICTIM, he would kill him. VICTIM has not seen VAN TUYL since that incident in 2019. VICTIM was also aware that VAN TUYL was previously incarcerated after being found guilty of his involvement in a plot to threaten a United States District Court Judge. Furthermore, VICTIM was aware of other state charges for assault and threats.

40.    WITNESS 1 was interviewed on January 23, 2024. WITNESS 1 met VAN TUYL in early-2023 virtually through a friend, WITNESS 2, playing online games. All three men also worked for the same company, DEPCOM Power. They regularly enjoyed playing online games together. WITNESS 1 only met VAN TUYL in person on one occasion in the summer of 2023. On December 18, 2023, VAN TUYL called WITNESS 1 and asked him if he "knew of anyone who could remove this person, VICTIM, from the face of the earth". Simultaneously, WITNESS 1 received a message through Facebook Messenger from VAN TUYL. The message contained personal information of VICTIM', to include current address, age, date of birth, and phone number. WITNESS 1 was shocked at the request and hung up the phone. WITNESS 1 contacted WITNESS 2 who still worked for DEPCOM Power. WITNESS 2 reported the information to DEPCOM Power security.

41.    WITNESS 2 was interviewed on January 29, 2023. WITNESS 2 had known VAN TUYL through extended family for approximately 10 years. WITNESS 2 confirmed WITNESS 1 contacted him on December 18, 2023, to report that VAN TUYL asked WITNESS 1 if he knew of anyone that "could take care of somebody". WITNESS 1 took this statement to mean that VAN TUYL was looking for someone to have VICTIM murdered and gotten rid of. WITNESS 2 reported this information to DEPCOM Power. As a result, VAN TUYL was eventually fired from DEPCOM Power. At the request of DEPCOM Power Security, WITNESS 2 contacted VAN TUYL on January 19, 2024, to determine where VAN TUYL had left the company work truck belonging to DEPCOM Power. VAN TUYL informed WITNESS 2 he had left the truck in a Wal-Mart parking lot in Gloucester, Virginia. WITNESS 2 believed that VAN TUYL may have been living with his wife's family in Gloucester, Virginia.

42.    On February 13, 2024, the case was transferred to the FBI Norfolk Division, Peninsula Resident Agency (PRA) due to VAN TUYL likely living in the Norfolk Division's area of responsibility.

43.    On February 28, 2024, a Facebook account for VAN TUYL was identified with the display name "Richard Vantuyl", the username of ravendaddy0728, and account ID of 100033712998738. The URL for VAN TUYL's Facebook account was https://facebook.com/ravendaddy0728. A review of the publicly accessible Facebook account revealed a post about VICTIM on December 11, 2023. VAN TUYL posted a screenshot of a TikTok account for @[VICTIM]037. The screenshot showed the account was not found and also stated that "only friends can send messages to each other". A message was accompanied with the screenshot stating "I find it so so funny someone waves

9

at me on ticktok then blocks me talk about trying to play mind games that isn't working. All I can do is laugh at you [VICTIM] i haven't even thought about ur cradle robbing butt till you pop up in my dm what f a g".

44. Your affiant obtained Virginia Department of Motor Vehicles (DMV) records for VAN TUYL to include a photograph of VAN TUYL. The photos posted on the Facebook account listed above appear to be the same person shown in the photo provided by Virginia DMV.

45. Your affiant obtained records from the United States District Court, Eastern District of Virginia showing a judgement against VAN TUYL signed on July 9, 2013. VAN TUYL was adjudged guilty to one count of Title 18 U.S.C § 876(c), Mailing a Threatening Communication. Furthermore, your affiant obtained court records from the Circuit Court of the City of Virginia Beach indicating VAN TUYL was found guilty of two counts of Virginia Code § 18.2-60, Threatened By Letter/Communication.

## CONCLUSION

46. Based upon the facts set forth above, I submit that probable cause exists to believe that the user of the account:

   **(1)**    https://www.facebook.com/profile.php?id=100033712998738

   may have violated 18 U.S.C. §§ 1958(a) which prohibits the use of mail or any facility of interstate or foreign commerce with the intent that a murder be committed in violation of the laws of any State or the as a consideration for the receipt of, or as a consideration for a promise or agreement to pay, anything of pecuniary value, or who conspires to do so.

47. I further submit that probable cause exists to believe that evidence, fruits, and instrumentalities of such violations will be found within the information associated with the Facebook, Inc. account

   **(1)**  https://www.facebook.com/profile.php?id=100033712998738

   (more particularly described in Attachment A).

48. Accordingly, I respectfully request the issuance of warrants directed to Meta Platforms, Inc., pursuant to 18 U.S.C. § 1958(a) authorizing the search and seizure of information, records, and stored electronic communications relating Facebook, Inc. account:

   **(1)**  https://www.facebook.com/profile.php?id=100033712998738

   The requested search warrants will be transmitted to personnel with Meta Platforms, Inc. and executed for purposes of obtaining the information in the account for the items noted

10

in Attachment B.

49.    Pursuant to 18 U.S.C. § 2705(b), I respectfully request that the Court enter an order commanding Meta Platforms, Inc. not to notify any other person, including the subscriber of the specified account, of the existence of the warrants, this affidavit, the applications, any returns and associated paperwork, because there is reason to believe that any such notification will result in: (1) destruction of or tampering with evidence; (2) intimidation of potential witnesses; or (3) otherwise seriously jeopardize the ongoing investigation by, for example, causing others with knowledge of the subject's activities to flee, or to mask their identity and activity thereby jeopardizing the ongoing investigation. Premature disclosure of the contents of this affidavit and related documents may compromise this ongoing investigation.

Jeffrey Noel
Special Agent
Safe Streets Peninsula Task Force
Federal Bureau of Investigation

This affidavit has been reviewed for legal sufficiency by Assistant United States Attorney Peter G. Osyf.

Reviewed:

Peter G. Osyf
Assistant United States Attorney

Subscribed and sworn to before me this **15th** day of March 2024, in the City of Norfolk, Virginia.

The Honorable Lawrence R. Leonard
UNITED STATES MAGISTRATE JUDGE

11